# IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF ARKANSAS
### TEXARKANA DIVISION

IN RE:  DANIEL E. LEWIS and                          CASE NO.: 4:20-bk-71735
       TAMI L. LEWIS, DEBTORS                      CHAPTER 13

DANNY JEWELL, CHARLOTTE JEWELL, and
CHANDLER INSURANCE AGENCY, INC.                      PLAINTIFFS

V.                                      AP NO.:  4:20-ap-07048

DANIEL E. LEWIS and TAMI L. LEWIS                    DEFENDANTS

### MEMORANDUM OPINION

Before the court is a *First Amended Complaint Objecting to Discharge and Dischargeability of Debt* ("Complaint") filed by Danny Jewell (individually, "Jewell"), Charlotte Jewell (collectively with Jewell, the "Jewells"), and Chandler Insurance Co., Inc. (individually, "Chandler Insurance" and collectively with the Jewells, the "Claimants") against Daniel E. Lewis (individually, "Lewis") and Tami L. Lewis (collectively with Lewis, the "debtors") on November 4, 2020, at docket entry 4.  The debtors filed their *Amended Answer to Complaint Objecting to Discharge and Dischargeability of Debt* on December 1, 2020, at docket entry 12.  The court heard this matter on November 3, 2021.  The Claimants appeared personally and by and through their attorney, Stephen T. Arnold, and the debtors appeared personally and by and through their attorneys, M. Michael Kinard and Marc Honey.  Thereafter, the court took this matter under advisement.

For the reasons stated herein, the relief sought in the Complaint pursuant to 11 U.S.C. § 727 is denied; the relief sought in the Complaint pursuant to 11 U.S.C. § 523 is granted in part and denied in part.  The court shall enter a separate judgment to this effect.

## I. Jurisdiction

This court has jurisdiction over this matter under 28 U.S.C. §§ 1334 and 157.  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) and (J).  The following opinion constitutes findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## II. Findings of Fact

The Claimants sought to deny the debtors their discharge pursuant to 11 U.S.C. § 727(a)(2) and (a)(4) and to determine dischargeability pursuant to 11 U.S.C. § 523(a)(2) and (a)(4).  The Claimants introduced no evidence relative to the section 727 causes of action.  At the conclusion of their case, the court dismissed the section 727 counts pursuant to Federal Rule of Civil Procedure 52(c) as incorporated by Federal Rule of Bankruptcy Procedure 7052 on the bases of insufficient evidence, Claimants' admission of abandonment, and the inapplicability of section 727 to a Chapter 13 discharge pursuant to 11 U.S.C. § 1328(a).

The factual predicates for the surviving dischargeability counts were the subject of state court litigation in Miller County, Arkansas (sometimes, the "State Court Litigation") that predated the filing of the present bankruptcy and resulted in a Final Judgment ("Judgment") adverse to the debtors.  The Claimants address that sequence of events in their Complaint as follows.

> 6. [Claimants] filed an Arkansas state court lawsuit against [the debtors] to recover the embezzled funds and obtained a Judgment in the sum of on or about $121,890.33[.]
>
> 7. [Debtors'] discharge of [Claimants'] debt as reflected in the foregoing Judgment should be denied under 11 USC 523(a)(2 [and] 4).

(Complaint, Nov. 4, 2020, ECF No. 4, at ¶¶ 6-7.)  In their prayer, the Claimants requested that "the foregoing Judgment entered in state court against [the debtors] in favor of [Claimants] be excepted from discharge[.]"  (Compl. at 5.)

A bankruptcy filing following a substantial adverse judgment is not unusual.  Equally, the basis of that judgment often gives rise to a complaint to determine the dischargeability of the judgment debt.  This, in turn, inevitably raises issues of res judicata and collateral estoppel.  Typically, the parties suss out prior to trial which matters are collaterally estopped and factually dispositive through motions for summary judgment.  That did not occur in this case.

Instead, the Claimants and the debtors filed pretrial briefs.  Each side argues for the inclusive or preclusive effects of res judicata and collateral estoppel.  Each brief also contains information, pleadings, exhibits, and references to the State Court Litigation.  Despite the court's admonition that they were not part of the trial record, those documents were not introduced, admitted, or fully supported by exhibits or testimony in the actual trial record before this court.[1] (Trial Transcript, Nov. 10, 2021, ECF No. 46, at 65, 79-82.)  The trial record does, however, include evidence that contextualizes the Judgment that each party introduced in support of the relief sought or defense offered.  Given this methodology, it is at times difficult to tell where the trial facts end and collateral estoppel begins.  Accordingly, the foundation of any analysis must begin with the facts established by the actual trial record complemented or restrained by the res judicata or collateral estoppel effects of the prior Judgment.

*A.  Facts Presented at Trial*

**1.  Chandler Insurance**

In April 2009, Jewell and Lewis joined in purchasing Chandler Insurance.  The Jewells acquired 51% of the stock; the debtors acquired the remaining 49%.  (Plaintiffs' Exhibit 18; Tr. Trans. at 8.)  Jewell obtained much of the financing for the purchase.  (Tr. Trans. at 8-9.)  Each

---

[1] This is not an instance where the attached exhibits formed part of the record as they would have if either or both parties had moved for summary judgment.

understood that Lewis was to run the day-to-day operations as president with Jewell a silent partner.[2]  Jewell's version is that he left everything up to Lewis.  Lewis testified that Jewell was an active but not always welcomed presence.  Regardless, Lewis was responsible for the bank statements, all of which came to him.  If there were problems with account balances, overdrafts, or a need for funds, Lewis would typically explain to Jewell that there was simply a downturn in business.  Jewell would accept Lewis's explanation and make a deposit.  This uneasy relationship continued until 2013.

In 2013, a banker alerted Jewell that a Chandler Insurance account was overdrawn.  This was not atypical, but, while interacting with the bank, Jewell discovered a dormant account that had been reactivated without his knowledge.  To Jewell, it looked like Lewis was depositing Chandler Insurance money into that account followed by unauthorized withdrawals.  Initially, Jewell thought approximately $3000 was at issue.

This knowledge precipitated an uncomfortable phase between the two parties as they tried to sort out their circumstances vis-à-vis Chandler Insurance.  They discussed Lewis paying the company back; his inability to do so resulted in a digression in their relationship, which included Jewell revoking Lewis's check signing authority.

The final straw came shortly thereafter when Jewell became aware of unpaid withholding taxes at Chandler Insurance.  The IRS demanded approximately $42,000 representing both employee withholding and the employer's contribution.  Jewell personally borrowed and deposited into a Chandler Insurance account sufficient funds for it to pay $26,646.79 in outstanding employee withholding taxes for which Jewell and Lewis had potential personal liability.  Lewis's

---

[2]  Jewell and Lewis both testified at the trial. Their spouses did not and are unremarked in the record before this court except as their interests appear in various exhibits and the Judgment.

inability to reimburse Chandler Insurance for the questionable withdrawals and the unpaid taxes ultimately, and cumulatively, led to the end of the parties' joint ownership of Chandler Insurance.

The Jewells and the debtors resolved their Chandler Insurance relationship by virtue of a Settlement Agreement dated April 24, 2014. The Settlement Agreement is not overwhelmingly expositive and purported to resolve differences that were later the subject of the State Court Litigation. In pertinent part, the agreement provided for the debtors to transfer their 49% interest in Chandler Insurance to the Jewells and to execute a $20,000 promissory note payable to the Jewells.

To that end, the debtors signed a promissory note to the benefit of the Jewells in the amount of $20,000 dated April 24, 2014. (Pls.' Ex. 19.) The debtors also signed a second promissory note to the Jewells in the amount of $2000 dated the same date. (Pls.' Ex. 20.) A handwritten notation on the second promissory note reduced the principal balance to $1100. (Pls.' Ex. 20.) Jewell testified that this second note represented other monies owed, but it is not referenced in the Settlement Agreement. Jewell did not know why.

The debtors defaulted on both the $20,000 and the $1100 notes. In 2016, the Jewells filed the State Court Litigation in Miller County, Arkansas for the debtors' failure to pay. The debtors counterclaimed for the loss of their 49% ownership of Chandler Insurance. (Tr. Trans. at 63.) It is unclear if Chandler Insurance was an original plaintiff to which a counterclaim was filed or if it was third-partied in (more likely the latter). During discovery, Jewell realized that the $3000 amount that originally alerted him to some discrepancies during his 2013 bank interaction may have been just a small part of the problem and that there might have been thousands of dollars in additional damages. That discovery resulted in Chandler Insurance pursuing damages of

$99,474.70 in the State Court Litigation, represented by Exhibits 5 through 11 discussed below. (Tr. Trans. at 61-62, 64, 103.)

A jury trial resulted in the Judgment in favor of the Jewells and Chandler Insurance for damages, costs, and attorney's fees.  The debtors received nothing on their counterclaim.  (Pls.' Ex. 24 at 3; Tr. Trans. at 63.)  Jewell testified that the debtors' request for a rehearing and appeal "w[ere] denied."  (Tr. Trans. at 62.)  Thereafter, the debtors filed their bankruptcy proceeding.  (Tr. Trans. at 62.)

### 2.  The $20,000 Note

The genesis of the $20,000 note called for the in the Settlement Agreement is both pertinent and, unfortunately, unclear.  Jewell testified that it had some nexus to the IRS debt.  Specifically,

> **Jewell's Counsel**: Tell us how you came up with the 20,000 dollar note exactly.

> **Jewell**: That was the amount—that was the amount that I determined at that time that Lewis owed as a part of his IRS obligation to me.

(Tr. Trans. at 55, 73.)  Congruently, Jewell described the $20,000 amount as "represent[ing] roughly one-half of the 42,000 of the taxes[.]"  (Tr. Trans. at 56.)  This makes some sense as the initial IRS demand was for approximately $42,000.  Jewell quickly funded the $26,646.79 that Chandler Insurance paid the IRS for the employee withholdings.  Chandler Insurance did not pay the balance representing the employer's contribution.  Jewell went on to testify that, when negotiating the Settlement Agreement concluding their relationship, he rounded one half of $42,000 to $20,000.  (Tr. Trans. at 55-56.)  The debtors did not counter with a different amount and Jewell was content with that number.  (Tr. Trans. at 56.)  This testimony neatly and exclusively ties the $20,000 note to the approximately $42,000 IRS demand in 2013.

6

Jewell, however, initially testified that the $20,000 figure was *not* just for the taxes. Rather, his calculus encompassed other adjustments attendant to a general settlement between the parties, including the transfer of the debtors' stock to the Jewells. (Tr. Trans. at 48.) Jewell testified.

> That was an agreement to—after we split, that was what was left over after a determination of the value of—of Chandler Insurance, what will have his share of the value of the corporation, less the monies he owed, less the IRS debt, which left him owing about 20,000 dollars to me for his IRS obligation.

(Tr. Trans. at 48.)

This disjunctive testimony is, however, contradicted and exacerbated by the Complaint. In the Complaint, the Claimants characterize the $20,000 note differently. There, the note represents a "reimbursement" resulting from the debtors "embezzling funds." (Compl. at ¶ 5.) The Complaint defines embezzled funds as "diverted insurance premiums payable to Chandler Insurance[.]" (Compl. at ¶¶ 5-6.) Additionally, the Complaint references Chandler Insurance as a payee of the promissory note, a fact wholly unsupported by the note, the Settlement Agreement, or the Judgment. (Compl. at ¶ 5; Pls.' Ex. 19.)

The Claimants' *Brief in Support of [Claimants'] Objection to Dischargeability of Debt* ("Claimants' Brief") only makes matters worse. Two contradictory origin stories are posited. In one part of the Claimants' brief, Jewell asserts that the "[d]ebtors owed him . . . $19,952.42 for the trust fund taxes penalty which culminated in the $20,000 Promissory Note." (Claimants' Brief, Feb. 22, 2021, ECF No. 16, at 3.) Then, however, the Claimants, in the same brief, directly tie the $20,000 note to a calculation involving the value of the debtors' stock in Chandler Insurance transferred to the Jewells as per the Settlement Agreement. (Claimants' Br. at 3-4.) Specifically, the Claimants explain that the Judgment dismissed the debtors' counterclaim against the Jewells "to recover [] their 49% interest in [Chandler Insurance] for allegedly $50,000.00 and other miscellaneous items" because the "[Jewells] and [d]ebtors had already settled these matters which

culminated in the $20,000.00 Promissory Note." (Claimants' Br. at 4.) This position, less dependent on the IRS demand and more related to a general settlement between the parties, more closely comports with Jewell's testimony set out above.

The most logical appreciation of the testimony before this court is that Jewell borrowed enough money to fund Chandler Insurance's check to the IRS for $26,646.79 because it represented potential personal liability for both Jewell and Lewis. Lewis could not then contribute. Thereafter, with knowledge of the full IRS claim and cognizant of other issues between the parties, the Jewells and the debtors reached a comprehensive settlement as expressed in the Settlement Agreement. That settlement included a $20,000 promissory note, which represented some unallocated and unquantified accommodation of the various issues between them including the Chandler Insurance payment to the IRS (funded by Jewell), the balance of the Chandler Insurance employer contribution amount owed the IRS, "less the monies [Lewis] owed," "other miscellaneous items," and the value of the debtors' stock transferred to the Jewells. (Tr. Trans. at 48; Claimants' Br. at 3-4.) This record does not reflect what value the parties attached to the stock transfer other than it represented some part of the net adjustments of the various issues and monies owed and outstanding between the respective parties, all of which culminated in an agreed $20,000 balance owing to the Jewells. In short, a settlement.

### 3. Damages

The Judgment awarded the Claimants an aggregate $131,890.33, in damages, attorney's fees, costs, and interest.[3] (Pls.' Ex. 24.) For "breach of contract" representing the debtors' default on the $20,000 and $1100 promissory notes, the court awarded the Jewells actual damages of

---

[3] The Complaint references a Judgment amount of "on or about $121,890.33," which may represent an omission of some fees or costs. (Compl. at 3.)

$21,288.86. (Pls.' Ex. 24.) For "fraudulent breach of fiduciary duty" representing the alleged unauthorized use of Chandler Insurance funds, the court awarded Chandler Insurance actual damages of $48,510. (Pls.' Ex. 24; Defendants' Exhibit 2.) Respective attorney's fees, costs, and interest comprised the balance.

In their Complaint before this court, the Claimants asked merely that "the foregoing Judgment entered in state court against [debtors] in favor of [Claimants] be excepted from discharge[.]" (Compl. at 5.) However, a disjunct exists between the damages of $131,890.33 expressed in the Judgment and damages in the amount of $206,811.38 that the Claimants now assert should be denied discharge based upon the testimony at the trial before this court. Sorting this out comports with our task of first delineating and, if appropriate, ultimately reducing the enhanced damage request based on the collateral estoppel effects of the Judgment.

In the trial before this court, the Claimants sought nondischargeability of damages in two general categories. For ease of understanding, they are categorized by this court as (i) non-tax related damages and (ii) tax related damages.

*i. Non-tax related damages*

In the State Court Litigation, Chandler Insurance claimed damages in the amount of $99,474.70 representing the alleged unauthorized use of Chandler Insurance funds. Despite an award of a lesser amount of $48,510 in the Judgment, the Claimants now ask this court to declare nondischargeable the entire original amount of $99,474.70.

The $99,474.70 amount is broken down into seven discrete bases as reflected on Claimants' Exhibits 5 through 11. Each of Claimants' seven supporting exhibits is captioned "Chandler Insurance Agency's Counterclaim," a clear reference to their use in support of the counterclaim asserted in the State Court Litigation. (Pls.' Exs. 5-11.) Jewell confirmed in his testimony that

9

these figures and exhibits were prepared for and introduced in the State Court Litigation and that each exhibit represented different categories of alleged unauthorized uses of Chandler Insurance funds.  (Tr. Trans. at 89.)

The first exhibit consists of forty-seven alleged unauthorized cash withdrawals from First National Bank Account No. 0548 between July 27, 2009 and February 28, 2013, in the aggregate amount of $22,809.65.  (Pls.' Ex. 5.)  The second exhibit consists of six cash withdrawals from First National Bank Account No. 2021 between June 8, 2009 and July 12, 2010, in the aggregate amount of $2750.  (Pls.' Ex. 6.)  The third exhibit consists of twenty-five cash withdrawals from the Bank of the Ozarks Account No. 1865 in the aggregate amount of $19,650.75.  (Pls.' Ex. 7.)

The fourth exhibit consists of an unspecified number of transactions designated as "Unauthorized Personal Use of Funds for 2012 and 2013" from a Bank of the Ozarks Account No. 12608 in the aggregate amount of $19,660.48.  (Pls.' Ex. 8.)  Jewell thought this account was dormant and not to be used.  (Tr. Trans. at 20.)  It originally had been set up as a sweep account, but Jewell contended that Lewis started to put commission checks into the account and then withdrew funds or wrote checks for his personal use.  Jewell testified that he did not know this account was in use.  The money in the account belonged to Chandler Insurance, not Jewell personally.

The fifth exhibit consists of "Unauthorized ATM Withdrawals from 2010 Through 2013" from multiple Chandler Insurance accounts in the aggregate amount of $1340.  (Pls.' Ex. 9.) Jewell testified that he knew Lewis had a debit card on account 1865, but he was unaware that Lewis had debit cards on other accounts.  Jewell believed that Lewis should not have had one on account 0548 because it was a sweep account for insurance purposes.  (Tr. Trans. at 28.)

The sixth exhibit is categorized as "Unauthorized Personal Use of Funds by Danny Lewis from 2010 through 2013" and is broken down into two categories: $22,450.82 as "Unauthorized" and $15,906.74 as "Maybe." (Pls.' Ex. 10.) In preparing this document, Jewell tried to parse between what he thought were unauthorized purchases for which there were few receipts versus questionable but potentially legitimate use of funds.

The seventh exhibit is denoted as "Overdraft and Non-Sufficient Funds Fees Charged to Chandler Insurance Agenc[y]" in the amount of $10,813.00. (Pls.' Ex. 11.) This amount represented overdraft charges to Chandler Insurance for which Jewell attached responsibility to Lewis. The damages claimed on the seven exhibits total $99,474.70. These exhibits were the same ones for the same amounts on which Chandler Insurance claimed damages in the State Court Litigation.

Perhaps due to each party's anticipated reliance on either the inclusive or preclusive application of collateral estoppel, the trial testimony regarding the unauthorized use of funds and the defenses thereto was rather brief and broad. Jewell and Lewis each briefly testified concerning the substance of whether the amounts suggested on Claimants' Exhibits 5 through 11 were authorized or unauthorized. Summarizing the exhibits, Jewell testified that Lewis "was simply defrauding me and the business." (Tr. Trans. at 25.) Jewell was comfortable that the withdrawals were not authorized or appropriate; Lewis was comfortable they were. Their truncated testimony is less reflective of a full exposition on the issue of fraud and perhaps better categorized as background and context to their respective reliance on the collateral estoppel effects of the same damages having been the subject of the State Court Litigation. In the words of Lewis on the stand, "I didn't know we were here to retry the case." (Tr. Trans. at 123.)

*ii.  Tax related damages*

The Jewells and the debtors purchased Chandler Insurance in April 2009 and operated it as a Subchapter S corporation with Jewell and Lewis on the board.  (Tr. Trans. at 101.)  Lewis was president.  Jewell testified that in March 2013, around the same time that he was hearing from the bank about overdrafts, an employee of Chandler Insurance alerted Jewell to certified letters from the IRS.  (Tr. Trans. at 34-35.)  Jewell spoke to Lewis who first indicated that the taxes had been paid.  Around two weeks later, Lewis admitted they had not and that he would help catch up.  This issue and the bank problems resulted in the Settlement Agreement, the breach of which eventually led to the State Court Litigation.

As for the tax debt, the Claimants identified withholding taxes in the amount of $41,827.70 and Federal Unemployment Taxes ("FUTA") of $777.99 for the years 2009 through 2012, which coincided with Lewis's tenure running Chandler Insurance.  (Pls.' Ex. 12.)  Withholding taxes are quantified and reported on Form 941s denoted as Employer's Quarterly Federal Tax Return[s].  According to Jewell, the Form 941s represent both withholdings withheld from employee pay and the matching portion that Chandler Insurance was to pay to the government.[4]  (Tr. Trans. at 38.)  Lewis either prepared or caused to be prepared the Form 941s and 940s for those years and signed each as the president of Chandler Insurance.  (Pls.' Exs. 13-16.)  Jewell testified that Lewis had assured him through the years that the taxes had been paid and continued to do so for at least two weeks after Jewell confronted him in 2013.  (Tr. Trans. at 39.)

As responsible parties with Chandler Insurance, both Jewell and Lewis were potentially liable to the IRS for the unpaid withholding taxes.  Jewell asked Lewis to pay one half; Lewis said

---

[4]  FUTA obligations are quantified and reported on Form 940, denoted as Employer's Annual Federal Unemployment (FUTA) Tax Return.

he could not.  (Tr. Trans. at 40.)  Jewell testified that "he" paid the IRS "the trust fund portion" (the employee withheld portion).  The payment was in the form of a check drawn on a Chandler Insurance account.  (Tr. Trans. at 42-43.)

Specifically, with a Chandler Insurance check drawn on the Bank of the Ozarks account dated April 4, 2014, Chandler Insurance paid $26,646.79 to the IRS.  (Pls.' Ex. 17.)  Jewell funded the check by borrowing money from a local bank and depositing that amount into the Chandler Insurance account.   Jewell signed the check with a memo line noting Chandler Insurance's employer ID number with the reference "Trust Fund Balance 2009 thru 2012."  (Pls.' Ex. 17.) This payment represented the trust fund amount, the amount withheld from employees' checks, but did not include Chandler Insurance's contribution/obligation.  This employee withholding amount represented potential personal liability for Jewell and Lewis.  Jewell presumed that he would settle later with Lewis.

The remaining balance of the initial IRS demand representing Chandler Insurance's contribution remains unpaid.  Unfortunately, that remaining balance has grown through the years. (Tr. Trans. at 44.)  Jewell testified that while it is an obligation of Chandler Insurance, he equally considers it an obligation of both his and Lewis "as responsible parties," a position that does not comport with their actual legal liability.  (Tr. Trans. at 44.)

Regardless, Jewell caused Chandler Insurance to file a proof of claim on behalf of the IRS in the amount of $55,557.07, which represents a "payoff of [Chandler Insurance's] tax liability through 4/30/19."  (Pls.' Ex. 22.)  Jewell testified that he has not paid the IRS this amount as he is hoping to have the debtors pay the same.

13

### iii. Summation

In sum, the Claimants now ask this court to find the following sums nondischargeable:

1) $99,474.70 representing the full alleged unauthorized use of Chandler Insurance funds reflected on Claimants' Exhibits 5 through 11, of which only $48,510 was awarded in the Judgment.

2) The IRS indebtedness of $55,557.07, an amount not mentioned or awarded in the Judgment.

3) Attorney's fees of $36,254.87 and interest in the amount of $5406.50 as of December 17, 2018, awarded in the Judgment.

4) Costs of $2618.31 awarded in the Judgment.

5) $7500 for "future fees" awarded in the Judgment "to be incurred in [the State Court Litigation] for entry of judgment, post-judgment discovery, enforcement of judgment, and any appeal which may follow."

(Tr. Trans. at 103-05; Pls.' Ex. 24.)  These amounts total $206,811.38.[5]

In quantifying their damages at the trial before this court, the Claimants did not particularize their damages in the context of the "breach of contract" award in the Judgment concerning the $20,000 and $1100 notes.  Rather, it appears that the $20,000 promissory note is facially subsumed in either category 1 or 2 above, the $99,474.70 in alleged unauthorized use of Chandler Insurance funds or the IRS indebtedness of $55,557.07.  Exacerbating matters, this might not even be correct.  As discussed above, Jewell was never completely clear on the basis for the $20,000 note, but he frequently tied it to the IRS obligation.  Jewell also, however, considered it part of his calculus as to what was owing between the Jewells and the debtors with respect to the transfer of the debtors' 49% interest in Chandler Insurance.  Further complicating matters, in their Complaint concerning nondischargeability, the Claimants characterized the $20,000 promissory note forming the basis of the Judgment differently.

---

[5]  There are some de minimis discrepancies that are ignored for purposes of this opinion.

> [Debtors] diverted insurance premiums payable to Chandler Insurance for their individual use and benefit. After [the Claimants] first learned about [the debtors] embezzling funds being diverted to a separate account in the name of Chandler Insurance and that these funds were transferred to [the debtors'] individual accounts and paid Debtors' individual creditors, [the debtors] signed a note for reimbursement of these funds to [the Claimants].

(Compl. at 2-3.)  As also outlined above and described in the Claimants' Brief, the Claimants characterize the $20,000 note as payment for a "trust fund taxes penalty" or, alternatively, as settlement for the debtors' "49% interest in [Chandler Insurance] . . . and other miscellaneous items."  (Claimants' Br. at 3-4.)

Juxtaposed against the $206,811.38 amount the Claimants now demand is the Judgment for damages in a lesser amount and on which the Claimants rely for the factual predicates for nondischargeability.  This, accordingly, requires an analysis of the facts the Judgment presents.

### B.  Facts Associated with the Judgment and Collateral Estoppel

The Claimants urge this court to afford collateral estoppel effect to the Judgment both for purposes of nondischargeability and for the full amount of the recovery therein plus, incongruously, more.  Equally, the debtors contend that the Judgment should have a more preclusive effect.  As previously noted, neither the Claimants nor the debtors filed motions for summary judgment to sort out the issue of collateral estoppel.  Each filed pretrial briefs with exhibits, many of which touch directly on the State Court Litigation, including pleadings, correspondence, jury instructions, and post-trial motions.  Unfortunately, most of those documents are not in this court's trial record.  The court repeatedly informed and emphasized to the parties that the exhibits to their pleadings were not in the record until they were introduced at trial.  (Tr. Trans. at 65-68, 79-82.)  For the most part, the parties chose not to introduce those exhibits. Accordingly, this record is formed by the exhibits, including the Judgment, testimony at trial, and references to the pleadings that outline the parties' respective allegations and positions.

15

The Jewells originally filed a complaint in state court against the debtors based merely on the two promissory notes, one for $20,000 and the other for $1100. The first note, for $20,000, was called for in the Settlement Agreement; the second note is inexplicably not mentioned. The debtors filed a counterclaim and presumably brought in separate Claimant, Chandler Insurance. Chandler Insurance filed a counterclaim against the debtors. A two-day jury trial resulted in the entry of a judgment favorable to the Jewells and Chandler Insurance.

The Judgment itself, dated and entered January 15, 2019, provides as follows.

### FINAL JUDGMENT

This action was tried before a jury on November 27 and 28, 2018, the Honorable David N. Laser, Circuit Court Judge (assigned), presiding. On November 28, 2018, the issues having been duly tried and the jury having rendered its verdict on interrogatories submitted by the Court, the Court entered this judgment pursuant to the verdict.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that [the Jewells] are hereby awarded Judgment against [the debtors] in the amount of $21,288.86 (Twenty-One Thousand Two Hundred Eighty Eight and 86/100 Dollars) as compensatory damages resulting from [the debtors'] breach of contract, as well as attorney's fees and expenses in the sum of $4,933.26 (Four Thousand Nine Hundred Thirty Three and 26/100 Dollars) and prejudgment interest in the amount of $3,198.53 (Three Thousand One Hundred Ninety Eight and 53/100 Dollars) through December 17, 2018, together with interest on the judgment as provided by law.

**IT IS FURTHER ORDERED** that [the Jewells] recover their costs in the sum of $170.00 (One Hundred Seventy and No/100 Dollars).

**IT IS FURTHER ORDERED AND ADJUDGED** that . . . Chandler Insurance [] is hereby awarded Judgment against . . . [the debtors], as compensatory damages resulting from [the debtors'] obtaining money from Chandler Insurance [] by fraudulent breach of fiduciary duty owed to . . . Chandler Insurance [], in the amount of $48,510.00 (Forty Eight Thousand Five Hundred Ten and No/100 Dollars), as well as attorney's fees and expenses in the sum of $38,264.87 (Thirty Eight Thousand Two Hundred Sixty Four and 87/100 Dollars), and pre-judgment interest in the amount of $5,406.50 (Five Thousand Four Hundred Six and 50/100 Dollars) through December 17, 2018, together with interest thereon as provided by law.

**IT IS FURTHER ORDERED** that [Chandler Insurance] recover its costs in the sum of $2,618.31 (Two Thousand Six Hundred Eighteen and 31/100 Dollars).

. . . .

**IT IS FURTHER ORDERED THAT** . . . Chandler Insurance [] is entitled to $7,500.00 (Seven Thousand Five Hundred and No/100 Dollars) in reasonable and necessary attorney's fees and expenses to be incurred in this matter for entry of judgment, post judgment discovery, enforcement of judgment, and any appeal which may follow.

[Clause dismissing with prejudice the debtors' claims against the Claimants.]

(Pls.' Ex. 24.)

The Judgment represents a final judgment; the Claimants seek to benefit from it in the form of collateral estoppel based on the language contained therein.  Notably, however, the Claimants argue they are not constrained by the very same Judgment, both with respect to the bases for damages and for the damages sought but not awarded by the jury in the State Court Litigation.

Conversely, the debtors urge this court to confine its analysis not to the Judgment but to the jury verdicts thereby reaching a conclusion favorable to the debtors.  The debtors preface their *Pretrial Brief* ("Debtors' Brief") as follows.

[The Claimants] in this adversary proceeding have two briefs to this Court which seem to suggest they intend to retry a case which was tried to a Miller County, Arkansas jury to completion.  There is no need to retry the case.  Rather, this Court need look only to the verdicts of the jury to determine whether the debts are dischargeable. The [debtors] suggest they are, indeed, dischargeable.

(Debtors' Brief, Sept. 7, 2021, ECF No. 32, at 1.)   The jury interrogatories that the debtors introduced at trial and on which the debtors focused in their Debtors' Brief provide as follows.

**INTERROGATORY NO. 1**:  Do you find from a preponderance of the evidence that the [debtors] are in breach of contract regarding the Promissory Note in the original principal amount of $20,000.00?

**ANSWER**:  Yes.

17

**INTERROGATORY NO. 3**:  Do you find from a preponderance of the evidence that the [debtors] are in breach of contract regarding the Promissory Note in the original principal amount of $1,100.00?

**ANSWER**:  Yes.

**INTERROGATORY NO. 5**:  Do you find from a preponderance of the evidence that the [debtors] breached the fiduciary duty owed to the Counter Plaintiff, Chandler Insurance [] ?

**ANSWER**:  Yes.

(Defs.' Ex. 2.)   The debtors attach significance to the absence of any reference to fraud or "fraudulent" in Interrogatory No. 5.

The debtors introduced three additional pertinent interrogatories.

**INTERROGATORY NO. 2**:  State the amount of any damages which you find from a preponderance of the evidence were sustained by [the Jewells] as a result of the breach of contract regarding the Promissory Note in the original principal amount of $20,000.00.

**ANSWER**:  $19,952.42.

**INTERROGATORY NO. 4**:  State the amount of any damages which you find from a preponderance of the evidence were sustained by [the Jewells] as a result of the breach of contract regarding the Promissory Note in the original principal amount of $1,100.00.

**ANSWER**:  $1336.44.

**INTERROGATORY NO. 6**: State the amount of damages which you find from a preponderance of the evidence was sustained by Chandler Insurance [] as a result of the breach of fiduciary duty or deceit.

**ANSWER**: $48,510.00

(Defs.' Ex. 2.)

Both Claimants and the debtors concede that the Judgment is final and withstood the debtors' post-judgment collateral attack.  In their Claimants' Brief, the Claimants asserted that "[r]epresented by new counsel, [d]ebtors filed a Motion to Correct and Amend Judgment after the

18

jury verdict which was denied and a belated Appeal which was dismissed[.]"  (Claimants' Br. at 6.)  The undisputed testimony at trial confirms this.  The debtors argued to the Miller County Circuit Court that the Judgment inappropriately interposed the word "fraudulent" with reference to the breach of fiduciary duty.  (Debtors' Br. at 6.)  The debtors' post-judgment efforts were unavailing.

### III. Analysis

Both parties expressed a reluctance to retry an extensive two-day jury trial.  The State Court Litigation concluded with a final Judgment.  The Claimants' section 523 causes of action set forth in their Complaint are solely and exclusively tied to the Judgment.  Jewell's testimony mostly served to contextualize the Judgment.  Lewis explicitly testified at trial: "I didn't know we were here to retry the case."  (Tr. Trans. at 123.)  His statement echoes the introduction to the Debtors' Brief.

> [The Jewells] in this adversary proceeding have two briefs to this Court which seem to suggest they intend to retry a case which was tried to a Miller County, Arkansas jury to completion.  There is no need to retry the case.  Rather, this Court need look only to the verdicts of the jury to determine whether the debts are dischargeable.  The [debtors] suggest they are, indeed, dischargeable.

(Debtors' Br. at 1.)

The result is a truncated trial record.  There was very little compelling testimony; only Jewell and Lewis testified.  Jewell broadly testified that the expenditures were unauthorized; Lewis broadly testified that they were authorized.  If confined solely to the non-Judgment record, the Claimants did not meet their burden under section 523.

The Judgment, however, appears to have conclusively resolved the issues between them.  The initial and apparent collateral estoppel effect of the Judgment suggests a finding of nondischargeability in favor of Chandler Insurance and a determination favorable to the debtors

with respect to the breach of contract award to the Jewells.  Yet herein lies the puzzler.  Despite the clarity of the Judgment, both the Claimants and the debtors ask this court to make findings and conclusions other than as suggested in the Judgment.  This effort, accordingly, requires first an analysis of what each party is asking the court to do in this case.

### A.  The Dichotomy

Despite the Judgment representing the basis for any resolution of this matter, both parties ask this court to look behind, restrict, reinterpret, recharacterize, or expand the Judgment as it benefits their respective positions.  Their efforts to do so are unavailing; rather, the application of collateral estoppel based on the Judgment suffices to compel the appropriate resolution.

### 1.  The Judgment

The Judgment represents the baseline.  It recites that a jury trial was held on November 27 and 28, 2018, before the Honorable David N. Laser, Circuit Court Judge, "and [that] the jury having rendered its verdict on interrogatories submitted by the Court, the Court enters this judgment pursuant to the verdict."  (Pls.' Ex. 24.)  The Judgment proceeds to award damages on two bases to separate parties.  The first is an aggregate award of $21,288.86 based on both promissory notes (the $20,000 and $1100 notes) against the debtors in favor of the Jewells for the debtors' "breach of contract."  (Pls.' Ex. 24.)  Added to those damages are attorney's fees, costs, and interest.  The second basis is an award solely to Chandler Insurance against both debtors for "obtaining money from Chandler Insurance [] by fraudulent breach of fiduciary duty owed to . . . Chandler Insurance [] in the amount of $48,510[.]"  (Pls. Ex. 24.)  Separate attorney's fees, costs, and interest are also assessed.

## 2. Claimants' Position

The Claimants' Complaint is exclusively couched in terms of the Judgment, asking that the debtors' "discharge of [the Claimants'] debt as reflected in the foregoing Judgment . . . be denied under 11 USC 523(a)(2) [and] (4)."  (Compl. at 3.)  The "debt" referenced in the Judgment is based on two causes of action: (1) "breach of contract" to the Jewells and (2) "fraudulent breach of fiduciary duty" to Chandler Insurance.  The first is generally dischargeable in a subsequent bankruptcy proceeding and favors the debtors.  The second sounds very much like the operative language in section 523(a)(4) concerning "fraud . . . while acting in a fiduciary capacity" and favors Chandler Insurance.

However, a subtle conflation begins in the Complaint.  Other than referencing the Judgment and attaching it as an exhibit, the Complaint draws no distinction between the two awards and characterizes the entire Judgment award as embezzlement, a term and basis that does not appear in the Judgment.  Additionally, Chandler Insurance is inaccurately included as a beneficiary of the promissory note "for reimbursement of these [embezzled] funds."  (Compl. at 2.)

This conflation continued up to and at trial.  In the Claimants' Brief, the Claimants recharacterize and expand the Judgment to benefit the Jewells with respect to the "fraudulent breach of fiduciary duty" language solely in favor of Chandler Insurance under the guise of a nonexistent finding of "embezzlement."  Specifically, the Claimants recite that in the State Court Litigation, Chandler Insurance filed a third-party complaint against the debtors for "*embezzling* $99,474.70" from Chandler Insurance, and that the jury awarded Chandler Insurance $48,510 from that complaint "*expressly described* as 'fraudulent breach of fiduciary duty.'"  (Claimants' Br. at 4) (emphasis added).  After essentially redefining the "fraudulent breach of fiduciary duty" phrase

used in the Judgment as embezzlement, the Claimants then go on in their Claimants' Brief to make the following remarkable statement.

> The conduct by [d]ebtors relating to the breach of fiduciary duty resulting in the IRS penalty for failing to pay the trust fund taxes for [Chandler Insurance's] employees and which resulted in the $20,000.00 Promissory Note signed by [d]ebtors, plus the increase of $30,557.07 from the original $25,000.00 IRS penalty to April 19, 2019 and any further increases, should be nondischargeable.

(Claimants' Br. at 7.) Rather than simply recognizing that the Judgment says what it says regarding a "fraudulent breach of fiduciary duty," the Claimants now argue that the Judgment should be recharacterized and expanded to encompass embezzlement. They further contend that the damages are not only the $48,510 that the jury awarded, but also the damages that the jury refused to award up to $99,474.70, plus the $55,557.07 IRS debt, plus fees, costs, and interest, all while subsuming and ignoring the actual basis for the breach of contract award.

The Claimants now seek nondischargeability for an amount considerably in excess of the Judgment, which is the sole and entire basis of their Complaint and the principal proof at trial. At trial, the Claimants abandoned the breach of contract award and subsumed it into either or both the $55,557.07 obligation owed to the IRS or the alleged unauthorized use of Chandler Insurance funds, while also increasing the latter from the $48,510 awarded in the Judgment to the $99,474.07 originally sought and rejected in the State Court Litigation. Specifically, and despite the Claimants' request in their Complaint to simply find the Claimants' "debt as reflected in the foregoing Judgment" nondischargeable, they now seek the following:

1) $99,474.70 representing the alleged unauthorized use of Chandler Insurance funds reflected on Claimants' Exhibits 5 through 11.

2) The IRS indebtedness of $55,557.07.

3) Attorney's fees of $36,254.87 and interest in the amount of $5406.50 as of December 17, 2018, awarded in the Judgment.

4) Costs of $2618.31 awarded in the Judgment.

5) Plus $7500 for "future fees" awarded in the Judgment "to be incurred in [the State Court Litigation] for entry of judgment, post judgment discovery, enforcement of judgment, and any appeal which may follow."

(Tr. Trans. at 103-05; Pls.' Ex. 24.)

This effort is not supported by the Judgment. The first category of $99,474.70, representing the alleged unauthorized use of Chandler Insurance funds, is the exact same amount requested in the State Court Litigation for which the jury found and capped at $48,510. Any increase in that amount is factually unsupported and contradicts the specific factual finding stated in the Judgment.

The second category, the IRS indebtedness of $55,557.07, is requested despite Jewell's testimony that the IRS obligation was subsumed into the $20,000 promissory note, which represented a key part of the Settlement Agreement and was the subject of the State Court Litigation and resulting Judgment. This belated reverse subsuming of the $20,000 note solely into the IRS debt ignores Jewell's testimony before this court, characterizations in the Complaint, and statements in the Claimants' Brief that the $20,000 note represented more than just the IRS debt. Rather, the note represents the net settlement of the issues between the Jewells and the debtors and encompasses embezzled funds, other monies owed, the IRS debt, and an unspecified and unquantified value of the debtors' interest in Chandler Insurance, which the settlement had them transferring to the Jewells. The record clearly demonstrates that the original IRS claim of approximately $42,000, which forms the entire basis for the current $55,557.07 claim, was known in 2013, that the Settlement Agreement occurred in April 2014, that the state court trial was in November 2018, and the Judgment was entered on January 15, 2019. The values or consideration attached to the various matters settled between the parties are unquantified and represented a

comprehensive and general settlement.  The court is not required, nor do the facts afford it the ability, to parse between these considerations and assign to the "embezzlement" any specific or quantified part of the $20,000 note and the then known issues it purported to reconcile and settle, including the IRS debt.[6]

The basis for the $20,000 promissory note has been a moving target throughout this adversary proceeding.  The Complaint makes no mention of taxes and characterizes the promissory note referenced in the Judgment as being a "note for reimbursement" of "diverted insurance premiums payable to Chandler Insurance for their individual use and benefit."  (Compl. at 2-3.) But, as outlined above and in Claimants' Brief, the Claimants on the one hand characterize the $20,000 note as payment for a "trust fund taxes penalty" but then, alternatively, as part of the settlement for the debtors' interest in Chandler Insurance and "other miscellaneous items." (Claimants' Br. at 3-4.)  Jewell testified that the $20,000 note represented outstanding taxes—an obligation that the parties were fully aware of at the time—but also included some settlement calculation of the value of the Chandler Insurance stock that the debtors transferred to the Jewells as part of the Settlement Agreement.  This dizzying array of sliding and alternating explanations for the note in question are, fortunately, resolved dispositively by the Judgment on the basis of a breach of contract for the failure to pay a promissory note and nothing else.

In sum, the Claimants' efforts to conflate the two Judgment debts, recharacterize the Judgment, and expand the Judgment are simply inappropriate.  The Claimants want the benefit of the Judgment but only as recharacterized and expanded.  Doing so belies the entire basis of collateral estoppel and, thus, the findings and conclusions herein are more appropriately confined

---

[6] As for any inference that the IRS debt grew post-Judgment, the $55,557.07 figure represents an accrual through April 30, 2019, a short period after the January 15, 2019 Judgment. The court's record is insufficient to reflect or calculate a significant or appreciable increase.

to the Judgment.  Further, to the extent the dischargeability action in this adversary proceeding is a different cause of action than that in the State Court Litigation (as discussed below), the trial record before this court is wholly insufficient to reach findings or conclusions favorable to the Claimants.  Without the Judgment, inclusive and preclusive, the Claimants failed to meet their burden of proof.

### 3.  Debtors' Position

The debtors take a different tact and argue that this court should afford the Judgment preclusive collateral estoppel effect to deny the relief sought in the Complaint.  Addressing principally the fiduciary duty grounds under section 523(a)(4), the debtors do not argue a lack of a fiduciary duty.  Rather, the debtors urge the court to look at the jury interrogatories, suggesting that they conflict with or diminish the actual wording of the Judgment.  Specifically, the debtors contend that fraud or "fraudulent" does not appear in the jury interrogatories but only in the Judgment.

The debtors focus on Interrogatory No. 5.

**INTERROGATORY NO. 5**:  Do you find from a preponderance of the evidence that the [debtors] breached the fiduciary duty owed to the Counter Plaintiff, Chandler Insurance []?

**ANSWER**:  Yes.

(Defs.' Ex. 2.)  At trial, and in their Debtors' Brief, the debtors argued that this interrogatory and answer reflect only a breach of fiduciary duty without any additional implication of fraud or defalcation while acting as a fiduciary.  Three bases belie this position.

First, the next interrogatory to the jury in the State Court Litigation, Interrogatory No. 6, provided:

**INTERROGATORY NO. 6**: State the amount of damages which you find from a preponderance of the evidence was sustained by Chandler Insurance [] as a result of the breach of fiduciary duty *or deceit*.

**ANSWER**: $48,510.00

(Defs.' Ex. 2) (emphasis added).  Although disjunctive, this instruction contains the word deceit, which lends some credence to the jury having the opportunity to examine more than a mere breach of fiduciary duty.  While a puzzler not fully resolved by this court's record, any ambiguity is resolved by the second basis—the Judgment itself specifically conjoins "fraudulent" with the breach of fiduciary duty.  (Pls.' Ex. 24.)  This finding is confirmed by the third basis—the post-Judgment collateral attack by the debtors on the very issue of the perceived inconsistency between the interrogatories and the final Judgment.  The Miller County Circuit Court rejected the debtors' effort and resolved the post-Judgment attack in favor of Chandler Insurance, affirming the survival and inclusion of the phrase "fraudulent breach of fiduciary duty" in the Judgment.  The debtors' appeal was equally unsuccessful.

In the Debtors' Brief, the debtors argue that this court should correct the perceived inconsistency between the jury interrogatories and the Judgment.  (Debtors' Br. at 13.)  This court, however, under the *Rooker-Feldman* doctrine, lacks the power to do so.  "The *Rooker-Feldman* doctrine precludes lower federal courts from exercising jurisdiction over actions seeking review of, or relief from, state court judgments."  *Hageman v. Barton*, 817 F.3d 611, 614 (8th Cir. 2016).  "[F]ederal review of state court decisions is vested exclusively in the United States Supreme Court."  *Snider v. City of Excelsior Springs, Mo.*, 154 F.3d 809, 811 (8th Cir. 1998).  Thus, "this [c]ourt is not an appellate court of the state courts and does not have jurisdiction to decide that the state court judgment was void."  *In re Ballinger*, 502 B.R. 558, 563 (Bankr. E.D. Ark. 2013).  Further, the *Rooker-Feldman* doctrine applies to "cases brought by state-court losers complaining

of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp*., 544 U.S. 280, 284 (2005).

Equally, "[u]nder the Full Faith and Credit Act, 28 U.S.C. § 1738, federal courts 'must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'" *Finstad v. Beresford Bancorporation, Inc.*, 831 F.3d 1009, 1013 (8th Cir. 2016). "The full faith and credit provision is applicable in dischargeability proceedings when certain issues relative to a determination by the bankruptcy court have already been decided by a state court judgment." *White v. Ouachita Cnty. Off. of Child Support Enf't Unit* (*In re White*), 253 B.R. 253, 255 (Bankr. W.D. Ark. 2000).

Accordingly, this court accepts the Judgment as is. It is a final and binding judgment on issues directly related to the factual predicates of the Claimants' effort to deny dischargeability of debt.

### B. The Law

### 1. Res Judicata and Collateral Estoppel

Before addressing the collateral estoppel effects of the Judgment, any role res judicata may or may not play must be considered. In the Debtors' Brief, the debtors suggest the application of res judicata. (Debtors' Br. at 12.) Res judicata, however, is not applicable in this instance. Expressly, "[t]he United States Supreme Court in *Brown v. Felsen* determined res judicata does not apply in nondischargeability proceedings." *Hellenbrand Glass, LLC v. Pulvermacher* (*In re Pulvermacher*), 567 B.R. 881, 886 (Bankr. W.D. Wis. 2017) (citing *Brown v. Felsen*, 442 U.S. 127, 138–39 (1979)); *see also Thomas, Inc. v. Pine Creek II Apartments, Ltd.* (*In re Pine Creek II Apartments, Ltd*.) 182 B.R. 36, 37 (Bankr. W.D. Ark. 1995) (noting that "*Brown's* rationale was

that it was solely for the bankruptcy court to determine the dischargeability of debts; such matters of federal law could not be determined by the state courts such that *res judicata* could not be applied to preclude relitigation of issues in dischargeability proceedings"). "Since *Brown*, 'there is a general rule that state court judgments do not have res judicata effect on nondischargeability actions under § 523.'" *Pulvermacher*, 567 B.R. at 886 (citations omitted).

Section 523(a) of the Bankruptcy Code enumerates several bases to deny the dischargeability of a specific debt. Although many of these grounds sound in contract or tort, which are typical state law causes of action, they are not causes of action for the purposes of establishing debt or damages. The purpose of each section is to determine if the debt or damages are nondischargeable. The obvious and apparent reason that so many of the nondischargeability causes of action mirror state or federal law causes of action, such as fraud, misrepresentation, and the like, is that those causes of action establishing liability and damages are of the type or nature that Congress wished to deny a discharge. Equally, and at times, the causes of action sufficiently mirror each other to in effect apply res judicata. Misrepresentation is a good example as the elements under state law are often identical to those considered by bankruptcy courts in determining nondischargeability. But, the grounds for nondischargeability are discrete and not necessarily the same causes of action as those for establishing the underlying liability or damages. Accordingly, res judicata is generally not the appropriate basis for determining the conclusive nature of a prior judgment under these circumstances.

Rather, the application of collateral estoppel is more appropriate. As previously stated, absent the Judgment, the Claimants have not met their burden of proof. The principles of collateral estoppel, however, compel the findings and conclusions reached herein.

28

In the context of nondischargeability actions, the Eighth Circuit has had recent occasion to state:

> The purpose of the collateral estoppel doctrine is to "protect[ ] litigants from the burden of relitigating an identical issue with the same party . . . and [to] promot[e] judicial economy by preventing needless litigation." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Judgment creditors who file adversary actions in bankruptcy court to except debt from discharge can invoke collateral estoppel. *Grogan v. Garner*, 498 U.S. 279, 284 n.11, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Actually-litigated elements of the prior claim that are identical to the elements required for discharge can be given "collateral estoppel effect" in nondischargeability proceedings. *Id.* at 284, 111 S.Ct. 654.

*Luebbert v. Global Control Sys.* (*In re Luebbert*), 987 F.3d 771, 779 (8th Cir. 2021).

In applying collateral estoppel, this court is bound by Arkansas law.

> The doctrine of collateral estoppel precludes a court from conducting further proceedings on issues that have been litigated and ruled upon previously. In determining whether the state court judgment is entitled to preclusive effect, the [c]ourt must apply the law of Arkansas. In Arkansas, four elements must be proven to establish collateral estoppel:

>> (1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) that issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the judgment.

*Sneed v. Hartsfield* (*In re Hartsfield*), 430 B.R. 181, 187 (Bankr. E.D. Ark. 2010) (internal citations omitted).

The Claimants seek to deny dischargeability on two bases, section 523(a)(2) and (a)(4). Despite relying almost exclusively on a Judgment that awarded separate damages on two bases, breach of contract and fraudulent breach of fiduciary duty, the Complaint conflated the factual predicates of each, requested relief under both section 523(a)(2) and (a)(4) in one count, and asked for the full amount of the Judgment plus more. The operative facts alleged are relatively abbreviated:

5.  [The debtors] diverted insurance premiums payable to Chandler Insurance for their individual use and benefit. After [the Claimants] first learned about [the debtors] embezzling funds being diverted to a separate account in the name of Chandler Insurance and that these funds were transferred to [the debtors'] individual accounts and paid Debtors' individual creditors, [the debtors] signed a note for reimbursement of these funds to [the Claimants]. Then [the debtors] embezzled additional funds by diverting insurance premiums directly to their own individual accounts and creditors.

6.  [Claimants] filed an Arkansas state court lawsuit against [the debtors] to recover the embezzled funds and obtained a Judgment in the sum of on or about $121,890.33[.]

7.  [Debtors'] discharge of [Claimants'] debt as reflected in the foregoing Judgment should be denied under 11 USC 523(a)(2 [and] 4).

(Compl. at 2-3.)  Thus, the issue now is whether the two principal awards in the Judgment, one for breach of contract and one for fraudulent breach of fiduciary duty, are entitled to collateral estoppel effect sufficient to deny dischargeability under sections 523(a)(2) or (a)(4).  Each is discussed in turn.

## 2.  11 U.S.C. § 523(a)(2)(A)

Chandler Insurance is entitled to a judgment of nondischargeability on the Judgment award on the basis of  11 U.S.C. § 523(a)(2)(A), which provides that a discharge under section 727 does not discharge a debtor from a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]"  11 U.S.C. § 523(a)(2)(A) (2021).  As this court has stated before, "[s]ection 523(a)(2)(A) provides three distinct, but often intermingled, bas[e]s for nondischargeability: false pretenses, a false representation, or actual fraud." *Quality Foods, Inc. v. Donckers* (*In re Donckers*), Adv. No. 5:05-ap-07158, 2006 WL 8067402, at *3 (Bankr. W.D. Ark. Apr. 26, 2006).

*i.  Fraudulent Breach of Fiduciary Duty*

The Judgment explicitly uses the phrase "fraudulent breach of fiduciary duty."  (Pls.' Ex.

24.)  "Actual fraud, by definition, consists of any deceit, artifice, trick or design involving direct

and active operation of the mind, used to circumvent and cheat another—something said, done or

omitted with the design of perpetrating what is known to be a cheat or deception."  *The Merch.*

*Nat'l Bank of Winona v. Moen* (*In re Moen*), 238 B.R. 785, 790 (B.A.P. 8th Cir. 1999) (citation

omitted).  The jury finding expressed in the binding Judgment would facially seem to encompass

sufficient grounds to afford the Judgment collateral estoppel effect on the basis of actual fraud.

Any doubt is resolved by the United States Supreme Court's decision in *Husky*.

The Supreme Court in *Husky* clarified the meaning of "actual fraud" in a manner sufficient

to encompass a finding of nondischargeability based on the Judgment and its finding of a

"fraudulent breach of fiduciary duty" against the debtors in favor of Chandler Insurance.  In *Husky*,

the Supreme Court directly addressed the question of whether a section 523(a)(2)(A) action for

actual fraud required a representation and concluded it did not.  While doing so, it recognized (1)

that "actual fraud" broadly encompassed many types of fraud and (2) there may even be some

redundancy or permissible overlap in circumstances involving a section 523(a)(4) action

concerning fiduciary capacity.  On the first point, the Court stated:

> This Court has historically construed the terms in § 523(a)(2)(A) to contain
> the "elements that the common law has defined them to include."  *Field v.*
> *Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).  "Actual fraud" has
> two parts: actual and fraud.  The word "actual" has a simple meaning in the context
> of common-law fraud: It denotes any fraud that "involv[es] moral turpitude or
> intentional wrong."  *Neal v. Clark,* 95 U.S. 704, 709, 24 L.Ed. 586 (1878).  "Actual"
> fraud stands in contrast to "implied" fraud or fraud "in law," which describe acts of
> deception that "may exist without the imputation of bad faith or immorality."  *Ibid.*
> Thus, anything that counts as "fraud" and is done with wrongful intent is "actual
> fraud."

Although "fraud" connotes deception or trickery generally, the term is difficult to define more precisely. See 1 J. Story, Commentaries on Equity Jurisprudence § 189, p. 221 (6th ed. 1853) (Story) ("Fraud . . . being so various in its nature, and so extensive in its application to human concerns, it would be difficult to enumerate all the instances in which Courts of Equity will grant relief under this head"). There is no need to adopt a definition for all times and all circumstances here because, from the beginning of English bankruptcy practice, courts and legislatures have used the term "fraud" to describe a debtor's transfer of assets that, like Ritz' scheme, impairs a creditor's ability to collect the debt.

. . . The degree to which this statute remains embedded in laws related to fraud today clarifies that the common-law term "actual fraud" is broad enough to incorporate a fraudulent conveyance.

*Husky Int'l Elecs., Inc. v. Ritz*, 578 U.S. 356, 360–61 (2016). On the second point, the Court

stated:

Ritz makes the unremarkable point that the traditional definition of "actual fraud" will cover some of the same conduct as those exceptions: for example, a trustee who fraudulently conveys away his trust's assets. But Ritz' interpretation does not avoid duplication, nor does our interpretation fail to preserve a meaningful difference between § 523(a)(2)(A) and §§ 523(a)(4), (6). Just as a fiduciary who engages in a fraudulent conveyance may find his debt exempted from discharge under either § 523(a)(2)(A) or § 523(a)(4), so too would a fiduciary who engages in one of the fraudulent misrepresentations that form the core of Ritz' preferred interpretation of § 523(a)(2)(A). The same is true for § 523(a)(6). The debtors who commit fraudulent conveyances *and* the debtors who make false representations under § 523(a)(2)(A) could likewise also inflict "willful and malicious injury" under § 523(a)(6). There is, in short, overlap, but that overlap appears inevitable.

And, of course, our interpretation of "actual fraud" in § 523(a)(2)(A) also preserves meaningful distinctions between that provision and §§ 523(a)(4), (a)(6). Section 523(a)(4), for instance, covers only debts for fraud while acting as a fiduciary, whereas § 523(a)(2)(A) has no similar limitation. Nothing in our interpretation alters that distinction. And § 523(a)(6) covers debts "for willful and malicious injury," whether or not that injury is the result of fraud, see *Kawaauhau v. Geiger,* 523 U.S. 57, 61, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998) (discussing injuries resulting from "'intentional torts'"), whereas § 523(a)(2)(A) covers only fraudulent acts. Nothing in our interpretation alters that distinction either. Thus, given the clear differences between these provisions, we see no reason to craft an artificial definition of "actual fraud" merely to avoid narrow redundancies in § 523 that appear unavoidable.

*Id.* at 363-64.

32

The broad and inclusive definition of "actual fraud" and the Judgment's pronouncement of "fraudulent breach of fiduciary duty" compels a finding and conclusion of nondischargeability based on section 523(a)(2)(A) in favor of Chandler Insurance.  The Judgment is clear that the debtors were acting in a fiduciary capacity and in its breach acted fraudulently.  The language does not permit or compel any conclusion otherwise.  Chandler Insurance's damages, however, are capped at $48,510.  This preclusive effect is generated as a result of the predicate language in section 523(a)(2)(A) that requires the debtors to "obtain[]" "money" by virtue of the actual fraud. Here, the money "obtained" from Chandler Insurance was previously set by the jury at $48,510, reflecting that the jury rejected any amount over that sum up to the requested $99,474.70.  The latter figure represented the amount that Chandler Insurance alleged the debtors misused or expended without authorization.  The jury disagreed and conclusively determined damages of only $48,510.

### ii.  Breach of Contract

Conversely, the Judgment contains no equivalent finding in favor of the Jewells, only a "breach of contract."  On that point, the debtors argue that an award for breach of contract is clearly dischargeable as a mere breach of contract generally does not provide a basis under section 523(a)(2) for a determination of nondischargeability.  However, any analysis of the collateral estoppel effect of this distinction is not necessarily inhibited by a previous judgment for breach of contract, particularly when the causes of action for dischargeability are different than those with respect to attaching liability or damages.  The Eighth Circuit has had recent occasion to address this issue.

In *Luebbert,* the bankruptcy court applied the "willful and malicious injury" standards contained in a section 523(a)(6) cause of action concerning dischargeability despite a breach of

contract judgment in a civil action between the same parties on the same facts. 987 F.3d 771. The latter cause of action established damages; the holder of the judgment sought to deny dischargeability of those damages based on a "willful and malicious" injury. The *Luebbert* court rejected the breach of contract cause of action basis as binding on the subsequent determination of dischargeability.

> Analyzing the willfulness element in *In re Geiger*, we held that "for a judgment debt to be nondischargeable under [§ 523(a)(6)], it is necessary that it be *based on* the commission of an intentional tort." 113 F.3d at 853 (emphasis added). We expressed "no view . . . on the question whether it is sufficient for nondischargeability that the *judgment be for* an intentional tort." *Id.* at 853–54 (emphasis added). We now take this opportunity to clarify our jurisprudence about exceptions to discharge under § 523(a)(6) and conclude that a judgment for an intentional tort is not necessary to find judgment debt for a breach of contract nondischargeable. The willfulness requirement is met when the bankruptcy court finds facts showing that the debtor's conduct accompanying the breach of contract amounted to an intentional tort against the creditor.

*Id.* at 782.

Thus, this court is not inhibited in its analysis by the breach of contract finding expressed in the Judgment. But, it is limited by both the record and the application of collateral estoppel insofar as some facts are concerned, which ultimately dictates findings and commensurate conclusions that the Jewells are not entitled to a judgment of nondischargeability on the two promissory notes and that neither Chandler Insurance nor the Jewells are entitled to a finding of nondischargeability for the $55,557.07, representing the indebtedness owed to the IRS. This conclusion lies regardless of the Claimants ignoring the Judgment's breach of contract award and apparently subsuming that award in either the unauthorized use of funds category, the outstanding obligation to the IRS, or both.

Several bases compel this conclusion. First, the Judgment is clear that the award for $21,288.86 to the Jewells is for a "breach of contract." (Pls.' Ex. 24.) Second, unlike *Luebbert*

where the record contained testimony independent of the prior judgment concerning the "willful and malicious" nondischargeability cause of action, the record before this court does not justify a different conclusion. The Jewells did not meet their burden sufficient to prove the discrete elements of nondischargeability under section 523(a)(2) separate and apart from the expressed findings contained in the Judgment. There is no testimony that the $1100 promissory note is anything other than a contract for which the Jewells are compensated for its breach. The origins of the $20,000 note are broad. The Complaint recites that the note represented reimbursement of embezzled or diverted funds. At trial, Jewell painted a more amorphous picture, testifying that it encompassed the IRS debt but also represented some unquantified inclusion of the value of the debtors' interest in Chandler Insurance. The note was attendant to the Settlement Agreement, an agreement that was memorialized at a time when all the particulars of the IRS debt were known to the parties. Neither the Judgment nor the evidence presented at the trial before this court proved that the debtors "obtained" an "extension of credit" from the Jewells represented by the $20,000 promissory note by false pretenses, a false representation, or actual fraud. The proof before this court is that the $20,000 note represented a resolution of the IRS debt, other monies owed, and the debtors' interest in Chandler Insurance that they were transferring to the Jewells. All of these factors and considerations, known to the parties and factored into their $20,000 settlement, are indivisible and unquantified. This court is not required to parse through them and determine which value should be attached to each.

Third, the Jewells cannot piggyback on Chandler Insurance's losses. Clearly, the Judgment demonstrates that the debtors obtained $48,510 from Chandler Insurance for the misappropriation of Chandler Insurance money. Those funds were monies of Chandler Insurance, not the Jewells. Furthermore, Chandler Insurance is compensated in the Judgment and in this determination of

nondischargeability. The fact that Lewis did not pay the withholding taxes does not mean he pocketed, or "obtained," the withholding funds. What Lewis pocketed was Chandler Insurance monies capped at $48,510.

Fourth, the debtors may have defrauded Chandler Insurance, but no evidence can be gleaned from the Judgment or the testimony before this court that the debtors defrauded the Jewells. The debtors and the Jewells accepted the promissory note with complete knowledge of the full IRS debt and that the debtors were making good on what they agreed to be an unquantified portion of that debt. If and to the extent any part of that debt is tied to the diverted or misappropriated funds, Chandler Insurance is compensated in both the Judgment and the denial of discharge herein. All of the evidence concerning any amounts taken by Lewis from Chandler Insurance passed through the Chandler Insurance banking accounts for which a jury verdict and Judgment reflect damages of $48,510. That figure represents the only money "obtained" by the debtors according to a Judgment for which the principles of collateral estoppel bind this court. The only proof is that Lewis did not pay the withholding. To the extent that he "obtained" funds in the sense required by the predicate to section 523(a)(2) causes of action, the amounts not paid to withholding were presumably subsumed into the aggregate funds from which Chandler Insurance alleged that Lewis improperly took for his own benefit as encompassed and set out in the Claimants' Exhibits 5 through 11 in the total amount of $99,474.70, for which the jury awarded only $48,510. Thus, Chandler Insurance now has a nondischargeable judgment for $48,510. Costs and attorney's fees are dischargeable under this analysis because those amounts were not "obtained" by the debtors.

### 3.  11 U.S.C. § 523(a)(4)

The Claimants also seek a determination of dischargeability based on "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4) (2021).  Facially, this seems appropriate because the Judgement expressly provided for damages to Chandler Insurance for a "fraudulent breach of fiduciary duty."  But, while certainly referencing the appropriate code section in their Complaint, the Claimants couched their allegations in terms of "embezzlement," a term not found in the Judgment, and asked that it apply to the entire Judgment award, including the breach of contract award to the Jewells.  Here, the Jewells are once again attempting to piggyback on the Judgment award to Chandler Insurance, hoping to conflate their breach of contract award with the fraudulent breach of fiduciary duty award.  Again, however, as with section 523(a)(2) above, the Jewells did not meet their burden sufficient to prove the discrete elements of nondischargeability under section 523(a)(4), including embezzlement, separate and apart from the expressed findings contained in the Judgment.

The Jewells failed to meet their burden for the following four reasons.  First, in neither the Judgment nor any proof before this court did the Claimants establish that the debtors took any funds belonging to the Jewells by a breach of fiduciary duty or embezzlement.  Second, any money taken by the debtors was that of Chandler Insurance.  Third, the $20,0000 note involves considerations other than the IRS obligation or unauthorized use of funds, to and including adjustments based on the value of the debtors' interest in Chandler Insurance transferred to the Jewells.  Fourth, the Judgment contains the phrase "fraudulent breach of fiduciary duty" solely with regard to Chandler Insurance.

As previously stated, "[s]ection 523(a)(4) excepts [from discharge] debts 'for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.'"  *Arvest Mortg. Co. v.*

*Nail* (*In re Nail*), 680 F.3d 1036, 1038 (8th Cir. 2012). "To prevent a debtor's discharge under § 523(a)(4), the objecting party must 'establish the following two elements: (1) that a fiduciary relationship existed between [the debtor] and [the objecting party]; and (2) that [the debtor] committed fraud or defalcation in the course of that fiduciary relationship." *U.S. Dept. of Labor v. Harris* (*In re Harris*), 898 F.3d 834, 842 (8th Cir. 2018) (citing *Jafarpour v. Shahrokhi* (*In re Shahrokhi*), 266 B.R. 702, 707 (B.A.P. 8th Cir. 2001). On its face, it appears in this instance that both elements of section 523(a)(4) are conclusively met in the context of the Judgment with respect to Chandler Insurance. The Judgment contains provisions finding a breach of fiduciary duty with damages in the amount of $48,510 and links that breach of fiduciary duty specifically to fraudulent conduct. (Pls.' Ex. 24.)

Despite the clear language of the Judgment, the court's inquiry does not end at this point. Rather, the character of the fiduciary relationship or capacity is significant in a section 523(a)(4) analysis as this court is not bound by state law in determining whether a fiduciary relationship existed. Specifically, "[w]hether a relationship is a 'fiduciary' one within the meaning of § 523(a)(4) is a question of federal law." *Reshetar Sys., Inc. v. Thompson* (*In re Thompson*), 686 F.3d 940, 944 (8th Cir. 2012) (citing *Nail*, 680 F.3d at 1039). The fiduciary duty is defined "in a 'strict and narrow sense,' and therefore does not embrace trustees of constructive trusts imposed by law because of the trustee's malfeasance." *Id.* (citing *Hunter v. Philpott*, 373 F.3d 873, 876 (8th Cir. 2004)). Further, the "fiduciary capacity . . . arise[s] from an express or technical trust created prior to the defalcation and without reference to it." *Int'l Fidelity Insur. Co. v. Herndon* (*In re Herndon*), 277 B.R. 765, 769 (Bankr. E.D. Ark. 2002). Finally, and significantly, "[t]rusts satisfying § 523(a)(4) can be created by state statute or by common law, as well as by contract." *Thompson*, 686 F.3d at 944 (citing *Barclays Am./Bus. Credit, Inc. v. Long* (*In re Long*), 774 F.2d

875, 878 (8th Cir. 1985)). The Claimants did not argue or present evidence specifically defining the nature of the fiduciary capacity, including allegations or jury instructions, on which the Judgment is based. The debtors did not argue that this adversary proceeding involved a fiduciary capacity other than as contemplated within the meaning of section 523(a)(4).

Regardless, Arkansas law provides the answer with respect to corporate officers and their relationship to the corporation that employs them. Specifically, the court in *Walmart Stores* stated:

> Arkansas jurisprudence "imposes a high standard of conduct upon an officer or director of a corporation[.]" *Raines v. Toney,* 228 Ark. 1170, 1178, 313 S.W.2d 802, 808 (1958). This court has held that an officer or director of a corporation owes a fiduciary duty to the corporation and its shareholders. *See Raines, supra.* The high standard of conduct owed by an officer to his corporation has also been codified in the Arkansas Business Corporation Act:
>
>> (a) An officer with discretionary authority shall discharge his duties under that authority:
>>> (1) in good faith;
>>> (2) with the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
>>> (3) in a manner he reasonably believes to be in the best interests of the corporation.
>
> Ark.Code Ann. § 4–27–842(a) (Repl.2001); *see also* Ark.Code Ann. § 4–27- 830(a) (Repl.2001) (establishing an identical standard of conduct for directors).
>
> This court imposes an even greater duty on a person who serves as both an officer and a director of a corporation. *See Raines, supra.* We have said that one who owes a fiduciary duty to a corporation may be subject to liability to the corporation for any harm resulting from a breach of his or her fiduciary duty. *See Long v. Lampton,* 324 Ark. 511, 922 S.W.2d 692 (1996).

*Wal-Mart Stores, Inc. v. Coughlin*, 369 Ark. 365, 369–70 (2007). The application of federal law in light of the Arkansas statute as applied and as interpreted by courts in Arkansas creates a "fiduciary capacity" relationship within the meaning of section 523(a)(4).

The Judgment specifically finds that the debtors obtained $48,510 from Chandler Insurance "by fraudulent breach of fiduciary duty owed to" Chandler Insurance. (Pls.' Ex. 24.) Interrogatory

No. 5 asked the jury to find whether the debtors "breached the[ir] fiduciary duty owed to [Chandler Insurance]" from which this court can also reasonably conclude that they first determined there was a fiduciary duty. (Defs.' Ex. 2.) Further, the debtors did not contest before this court either the existence of a fiduciary duty between the debtors and Chandler Insurance or that it had not been breached. Interrogatory No. 6 included a basis of deceit. (Defs.' Ex. 2.) The Judgment not only uses the term "fraudulent breach of fiduciary duty" but that finding withstood the debtors' post-judgment collateral attack and an unsuccessful appeal. Further, the Arkansas statute and common law create a fiduciary relationship or "capacity" related to the funds within the fiduciary's control sufficient under federal law to find that the fraudulent breach thereof results in nondischargeability of the commensurate debt for its breach. The award of $48,510 plus attorney's fees, costs, and interest awarded to Chandler Insurance in the Judgment is nondischargeable pursuant to section 523(a)(4) for "fraud . . . while acting in a fiduciary capacity[.]" 11 U.S.C. § 523(a)(4).

The debtors' conduct as described in the Judgment also meets the lesser standard of a defalcation while acting in a fiduciary capacity. "Defalcation is defined as the misappropriation of trust funds or money held in any fiduciary capacity; [and the] failure to properly account for such funds." *U.S. Dept. of Labor v. Harris* (*In re Harris*), 561 B.R. 726, 735 (B.A.P. 8th Cir. 2017). In *Bullock*, the court elaborated that a defalcation requires a specific showing of "intentional wrong." *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013).

> [W]here the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong. We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent. Thus, we include reckless conduct of the kind set forth in the Model Penal Code. Where actual knowledge of wrongdoing is lacking, we consider conduct as equivalent if the fiduciary "consciously disregards" (or is willfully blind to) "a substantial and unjustifiable risk" that his conduct will turn out to violate a fiduciary duty. That

risk "must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves *a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation.

*Id.* at 273–74 (2013). In *Bullock*, the Court also noted that "'defalcation,' unlike 'fraud,' may be used to refer to *nonfraudulent* breaches of fiduciary duty." *Id.* at 275. Hence, the Judgment forms a sufficient basis under collateral estoppel to find that the debtors committed a fraud or defalcation while acting in a fiduciary capacity.

As for the Jewells, the record contains no testimony or evidence whatsoever that the debtors took any funds from the Jewells. Lewis spent Chandler Insurance funds that he should not have in the amount of $48,510. As for the IRS obligation, the only proof in this record is that the IRS obligation was known to the parties at the time of the Settlement Agreement and that the $20,000 promissory note was executed to address that obligation as well as other unquantified considerations and adjustments, including principally the transfer of the debtors' Chandler Insurance stock to the Jewells. There are insufficient facts for this court to parse between the various considerations making up the $20,000 promissory note to compel any conclusion that this amount and the breach thereof represented anything other than a normal breach of contract as provided for in the Judgment.

The standards for collateral estoppel have been met in favor of Chandler Insurance on the factual predicates for both the section 523(a)(2) and (a)(4) causes of action. *See Hartsfield*, 430 B.R. at 187. The State Court Litigation determined that a fiduciary capacity existed and that the debtors committed fraud in the context of that relationship. Those issues were actually litigated over two days before a jury and a valid and binding final judgment was entered finding that the debtors obtained money from Chandler Insurance by "fraudulent breach of fiduciary duty." (Pls.' Ex. 24.) As contemplated in *Husky*, some overlap exists as to both section 523(a)(2) actual fraud

and section 523 (a)(4) fraud or defalcation; this overlap, however, reinforces rather than diminishes the collateral estoppel effect of the Judgment.

Additionally, Chandler Insurance is entitled to a finding of nondischargeability concerning the attorney's fees, costs, and interest awarded it in the Judgment.  Relief under section 523(a)(4) is for a "debt" and so it is not limited by the "obtained" predicate in section 523(a)(2).  This court does note that the award of attorney's fees, plus fees for a future appeal, based on fraud do not seem appropriate under Arkansas law.  But, as discussed above, both the *Rooker-Feldman* doctrine and full faith and credit prevent this court from parsing the Judgment and ruling otherwise.

### IV.  Conclusion

The relief sought by the Jewells in the Complaint is denied.  The relief sought by Chandler Insurance is granted and a judgment of nondischargeability will be entered in the amount of $48,510 plus costs, interest, and attorney's fees as awarded in the Judgment.  Each side is to bear their respective attorney's fees and costs.

IT IS SO ORDERED.

Dated this 4th day of February, 2022.

_____
HONORABLE RICHARD D. TAYLOR
UNITED STATES BANKRUPTCY JUDGE

cc:    Daniel and Tami Lewis
       Danny and Charlotte Jewell
       Marc Honey
       M. Mike Kinard
       Stephen T. Arnold